Hailan Cui v State of New York (2025 NY Slip Op 51926(U))

[*1]

Hailan Cui v State of New York

2025 NY Slip Op 51926(U)

Decided on November 25, 2025

Court Of Claims

Shillingford, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on November 25, 2025
Court of Claims

Hailan Cui, AS ADMINISTRATOR FOR THE 
 ESTATE OF YANFANG XIE AND HAILAN CUI, INDIVIDUALLY, Claimants,

against
The State of New York, Defendant.

Claim No. 137097

For Claimant:
YK LAW LLP
By: Jesse Weiner, Esq.
For Defendant:
HON. LETITIA JAMES, New York State Attorney General
By: Cheryl Rameau, Esq., Assistant Attorney General

Ruth Shillingford, J.

Claimants, Hailan Cui, as Administrator for the Estate of Yanfang Xie (hereinafter "Miss Xie"), and Hailan Cui, Individually, filed this Claim seeking damages for wrongful death and negligent supervision resulting from the death of Miss Xie, then allegedly a resident at the Manhattan Psychiatric Center (hereinafter "MPC"), whose body tragically was found in the East River. A unified trial was conducted, with the parties subsequently filing post-trial briefs. This Decision follows. 
Claimant Cui testified and presented the testimony of Terri Ann Paul and Dr. Glenn Kalash. Lucy Borges-Smith, Sanju Thomas and Dr. Matthew Majeske appeared on behalf of Defendant. The parties consented to admission of Claimant's Exhibits 1-4, 6-13; and Defendant's Exhibits A-H, and J-W.[FN1]

After Claimants rested, Defendant made an application for a directed verdict and the Court reserved decision at that time and upon the reiteration of Defendant's motion at the end of Defendant's case.
The Court now makes the following Findings of Fact and Conclusions of Law, finding in [*2]favor of Defendant.
 FINDINGS OF FACT [FN2]
CLAIMANTS' CASE
Terriann Paul, treated as a hostile witness at trial, had been employed as a Social Worker for Family Care with the Manhattan Psychiatric Center ("MPC") since 2016. Her job entailed placing patients who had no family members with whom they could reside after their psychiatric hospitalization with outside providers. If the patient matched with the family in question, they would then live there. Her duties and that of her team were to ensure that the client had all necessary items at the home and to supervise the provider. This was all part of the Family Care program.
Miss Xie, who had been diagnosed with schizophrenia and perhaps bi-polar disorder, was one of her clients. Ms. Paul first met her in 2016 while Miss Xie was residing in the Bronx with a Family Care provider named Ms. Robinson. Miss Xie was also receiving outpatient treatment, including with her psychiatrist and her social worker, at the O.P.D. Clinic ("the Clinic") located on Adam Clayton Boulevard and 125th Street in Manhattan. Ms. Cui served as Miss Xie's emergency contact from 2016, and her name and telephone number were listed in the emergency contact list dated April 19, 2019 (Defendant's Exhibit D; T3: 21-23). Ms. Paul had always been in contact with Ms. Cui.
The usual practice was that the driver of a van would drop the clients off at the Clinic at around 9:30 or 10:00 a.m., and would then leave the location around 12:30 or 1:00 p.m. Miss Xie would "wander off" at least two or three times a month and miss the bus, causing Ms. Paul and her team to search the area for her. Ms. Paul would also call Ms. Cui to inquire about Miss Xie's whereabouts. Ms. Paul cared very much about her clients, including Miss Xie, and would warn her about the dangers of wandering off to places like the McDonald's across the street from the Clinic and sitting out on a bench by herself. 
Sometimes Miss Xie would disappear for "a couple of days" and "then sometimes it'll be like four, five [days] or maybe a week" (T3: 32). Ms. Paul would contact Ms. Cui when the team "noticed that [Miss Xie's] gone for a week, of course" (id.). Upon the refreshment of her recollection, Ms. Paul recalled that Miss Xie had attempted suicide in February 2019. She was admitted as a patient at Jacobi Hospital and later discharged to the Crisis Residence (hereinafter "Crisis") on March 8, 2019. Miss Xie was no longer in her care once she was discharged by Jacobi Hospital to Crisis. Ms. Paul had no recollection of Miss Xie disappearing on March 12, 2019, since she was not in her unit. 
The difference between the Transitional Living Residence ("T.L.R.") and Crisis is that "it's like two different residents. You got T.L.R. Transitional Living Residence and then you have another building with the Crisis. Crisis would cater to other individuals who are, I believe, undocumented" (T3: 67). Crisis is not open from 8:00 a.m. to 4:00 p.m. Residents at Crisis are free to leave Wards Island and "are able to come and go as they wish" (T3: 62-63). Those [*3]clients in Family Care were also free to leave the assigned home on their own. It is about a thirty-minute walk from the Queens entrance on Wards Island to the Manhattan Psychiatric Center ("MPC"). 
There are two completely different approaches to the responsibilities at Family Care and Crisis, which is located on Wards Island. When a client is missing, the Family Care team will initiate a "diligent search" of, inter alia, shelters and hospitals; contact family members; and they "don't stop until [they] get some kind of communication to locate that particular client." Ms. Paul undertook such searches regarding Miss Xie (T3: 60; 72-73). On the other hand, "Crisis, the staff, they're not leaving the island, they're not doing any of that" (id.). Rather, the staff at Crisis would call the Justice Center; complete an incident form; and advise the assigned social worker, who would call the police within forty-eight hours. The police would then come to Wards Island and initiate a Missing Person's Report (T3: 64-67; 69-70). Ms. Paul never looked at the rules for Crisis; rather, her testimony about the absence of a "diligent search" requirement was based on her observations while working overtime at T.L.R.
A Progress Note reflected that on March 12, 2019, Miss Xie failed to return for 7 p.m. curfew at T.L.R. and was later found at the Queens entrance on Wards Island on March 13, 2019. Ms. Paul related that since Miss Xie had been discharged from Family Care, she did not know when precisely she was found. However, Miss Xie was then sent to New York-Presbyterian Weill Cornell Hospital. 
According to Ms. Paul, "The high-risk list would be individuals who tend to miss their doctors' appointments, with their psychiatrist. If they miss, like, three or four consecutive appointments, we would put them on the high-risk list" (T3: 47). Ms. Paul could not recall if Miss Xie was ever placed on the high-risk list. Placement on this list requires an enhancement of the number of visits to the psychiatrist.
The various factors for consideration of placement on the high-risk list are "Suicide attempt within the past year 
...Suicide Care Pathway... Current violent ideation ...Suicidal ideation with plan 
...Arrest for violence within the past year ...Active order of protection High Risk Rating on the Violence Risk Assessment form" (Defendant's Exhibit S; T3: 52). Miss Xie exhibited the risk factors for attempted suicide and suicidal ideation with plan. Ms. Paul did not know if Jacobi Hospital had placed Miss Xie on the high-risk list after they discharged her to Crisis in March 2019. 
Since Miss Xie was no longer in Family Care, Ms. Paul was not aware of her disappearance in April 2019. The curfew for Crisis in 2019 was 10:00 p.m. on weekdays and 11:00 p.m. on weekends. If a patient did not return by curfew, the protocol would be to call the Justice Center and Ms. Paul believed that the social workers would then initiate a call to 911. While she would call Ms. Cui when Miss Xie disappeared while she was a client in Family Care, she did not know if the protocol was followed at Crisis since she did not work in that Unit. Nor did she know the identity of Miss Xie's assigned Social Worker there. She was devastated by the news of Miss Xie's death and attended the funeral on her own personal accord.
Claimant Cui had a very close relationship with her Aunt, Miss Xie, both in China and when they came to the United States. She described their relationship as that of a mother and a sister; she lived with her Aunt in China for an extended period from the time Ms. Cui was an adult. Her Aunt was her sole relative in the United States. Before the diagnosis of her mental illness, Miss Xie participated in many non-profit activities and social events, and was outgoing, with many friends. She earned her undergraduate degree in China and worked in real estate [*4]development. She owned her own business in the United States and worked in media and public relations for not-for-profit organizations.
In 2008, Ms. Cui received a call from one of Miss Xie's friends stating that her "[A]unt is bad" (T1: 37). By the time she arrived, the police were present and transferred Miss Xie to the hospital. At that time, her Aunt was hearing voices and the doctor indicated that she suffered from schizophrenia and bipolar disorders. Following her discharge from the hospital, Miss Xie lived with Ms. Cui for several years during which time she would see her friends and her doctors. Then in 2012, "she became a crazy, mad" (id. at 40). At that specific time, Ms. Cui was traveling and when she could not reach Miss Xie, she called the police. They eventually found Miss Xie, who had not taken her medication for several days. She was then hospitalized at Bellevue Hospital for a long period of time.
Miss Xie was then transferred to MPC's hospital in 2013 and then to the Crisis Residence a year later in 2014. In 2016, she was transferred to Family Care. Ms. Cui saw her Aunt three or four times a month during the weekends and on holidays. During her time in Family Care, Miss Xie was transported by bus to 125th Street for various activities and lunch; the bus then returned her to Family Care. 
In February 2019, after Ms. Cui was unable to reach Miss Xie, she learned from Faith Robinson, the Family Care homeowner, that Miss Xie had been transferred to Jacobi Hospital. During her visit at the hospital, Ms. Cui observed that Miss Xie was "[l]ike a vegetable, not much expression, very dumb" (T1: 46). Around mid-March 2019, Ms. Cui received a call from MPC advising that her Aunt was at that location. She saw her twice since that time — once in person, and the second time, via video. The latter time was when her friend took some items that Miss Xiu requested during her first visit. The friend then made a video in which Miss Xiu thanked Ms. Cui for the items. No one advised her that her Aunt had thereafter been admitted to New York-Presbyterian Hospital. The next time she would see her Aunt was after her body had been found in the East River.
There are two ways to get to Wards Island: by bus or driving. At this point in April, 2019, Miss Xie went for her treatment at 125th Street but had "no capability to do anything, nor [did] she have any money to do anything" (T1: 66). She had never attended any program along 111th Street. Claimants' Exhibit 9A displays the T.L.R Building, the MPC Hospital, the Crisis Building and the gate (T1: 67-68). The last place Ms. Cui saw her Aunt was at the Crisis Building. Exhibit 9b reflects the direction which Ms. Cui drove when going to the Crisis Building: she drives through a gate where an employee sits; then goes to either parking lots at P1 and P2. There is also a gate near P2 (T1: 69-70).
The last time she went to visit her Aunt, she drove past the gate without being stopped by any employee; and went to the Crisis Building (hereinafter "Crisis"). She had to check in at the Nurses' Station to tell them whom she was there to visit, and they called her Aunt to come visit with her in a small area. If she wanted to take her Aunt out for several days, as she had done on many occasions in 2015, she needed permission from the medical staff due to the medications that were required by her Aunt. She never had the opportunity to do so in 2019 (T1: 71-72). Exhibit 11 depicts a gate which bore a sign that it was a "24 hour emergency entrance" that is close to the T.L.R. Building which was closed most of the time. On one occasion prior to 2019, Ms. Cui saw it open, and it remained open, without a guard throughout her visit with her Aunt. It was "a long time open" (T1: 76; 86). This should have been prior to the period when her Aunt lived in Crisis in either 2015 or 2016.
On April 10, 2019, at about 3:00 p.m., Ms. Cui received a call from a male staff member of MPC inquiring if she had seen her Aunt. When she said that she had not seen her, the caller stated that Miss Xie had been missing but was not sure as to the duration of time. He suggested that she file a Missing Person's report and look for Miss Xie. Ms. Cui then drove around Wards Island, including around MPC. She also walked around 125th Street, stopping in stores and at a McDonald's that Miss Xie had frequented, and speaking to outside vendors, to no avail. The next day, Ms. Cui's friend, Martin, also drove her car looking for Miss Xie. They searched around Randall's Island, 125th Street, and around Columbia University. On April 13th, she showed Miss Xie's picture to patrol officers who indicated that no Missing Person's Report had been filed in Miss Xie's case. When, on April 14th, Martin confirmed at the 25th Precinct that, in fact, there was no Missing Person's Report, he was not permitted to file one since he was not a relative. Ms. Cui filed one later that day. While searching for her Aunt at MPC, Ms. Cui would walk around its surrounding areas and along the river (T1: 77).
Around 9:00 p.m. on April 14th, Ms. Cui, accompanied by Detective Stackpole and two other officers went to the Crisis Building. The two officers went into Miss Xie's room. Following conversations with the nurses and roommates, the group went to the T.L.R. building and spoke with the on-duty clerk. At the behest of personnel, the next day Ms. Cui went to the Crisis Building to retrieve her Aunt's personal belongings. When she spoke with the Director at T.L.R. about the precise time of her Aunt's disappearance, they refused to show her the log book which has information related to when persons check in and out.
While Detective Stackpole had remained in constant contact with her, at 7:00 a.m. on April 18th, he called to ask her to go to the Coroner's Office to identify a body which had been retrieved a day earlier from the Upper East Side, specifically at 110/ 111th Street and the East River (Claimant's Exhibit 8A). Detective Stackpole escorted her and Martin, and after much emotional difficulty, Ms. Cui identified her Aunt. After holding Miss Xie's body at the funeral home for one month while the family tried to secure visas for family members in China, the Funeral Home advised Ms. Cui that it must move forward with the funeral arrangements. The funeral was particularly difficult as Miss Xie had to be placed in a black bag and rather than the makeup seen in movies, Miss Xie's "face was green and the hair was wet and the muscles all sucked in there was no muscles on the face and the hair was messy and totally wet" (T1: 56-57). Other than Ms. Cui and her mother, no one was able to see Ms. Xie in her closed coffin. 
Following her Aunt's disappearance, the MPC staff readily spoke with Ms. Cui but, once the police became involved, they no longer cooperated with her. She believed that MPC staff had been helpful in the years that they found treatment for Ms. Xie and helped find Family Care housing for her, but they never reported her missing for many days before they informed Ms. Cui. Miss Xie was not a United States citizen and did not have a green card. Ms. Cui did not rely on her Aunt, who was not working, for financial support in 2019. Miss Xie lived in the Crisis Residence for a period of time from 2015, but Ms. Cui could not remember the precise length of time. Ms. Cui last saw her Aunt some time before March 25, 2019.
On cross-examination, Ms. Cui claimed that the man who called her from Crisis Residence on April 10th never told her to file a Missing Person's Report during their five-to-ten-minute conversation (T1: 85). She took the photo depicted in Claimant's Exhibit 9 in December 2022 and the gate looked the same as in 2019.
At the time of trial, Dr. Glenn Kalash served primarily as the Vice-Chairman of the Department of Psychiatry and Behavioral Sciences at Nassau University Medical Center, as well [*5]as the Medical Director of the Chemical Dependency Services and Director of Consultation Liaison Psychiatry. While his specialty is psychiatry, he also has "subspecialty certifications in forensic psychiatry, consultation liaison psychiatry, brain injury medicine and addiction medicine;" he is board-certified in these areas (T1: 89-90). Dr. Kalash was deemed an expert in psychiatry.
Dr. Kalash reviewed, inter alia, "primarily the inpatient psychiatric records from Jacobi Hospital" and the outpatient progress notes from MPC (T1: 93). Prior to her death, Miss Xie was on a monthly injectable antipsychotic, Haldol Decanoate; an oral antipsychotic; and a mood stabilizer. "The antipsychotics work primarily on the dopamine system associated with disorders like schizophrenia or schizoaffective disorder. They help psychotic symptoms to assuage psychotic symptoms such as hallucinations, delusions, thought disorder. And the Decedent was also on a mood stabilizer called lithium, which is often prescribed for people with mood lability such as bipolar disorder or depression" (T1: 94). About a year prior to her death, she had been on antidepressants; electroconvulsive therapies ("shock treatments") and "Clozaril, a medication that is used when other medications have failed to work to help a person's symptoms" (T1: 94-96). Treatment-refactory disorder "means when conventional treatments, either singular medications or combination medications don't have a robust effect after more than two or three trials of medications of sufficient lengths of time, if the symptoms persist, they're considered to have a treatment-refactory disorder" (T1: 95-96). 
A patient who stopped taking the requisite medications would begin to decompensate. Dr. Kalash's expert opinion was that the State did not exercise its duty to protect Miss Xie; "that knowing the course and the extent to the Decedent's psychiatric history, the State would more likely than not know that she was incapable of taking medications on her own, or managing her medications on her own, and was prone to wandering and prone to both mood and psychotic systems" and thus its supervision of her was not appropriate given her mental illness (T1: 97). Finally, his opinion was that the lack of supervision and care were a factor in her death. To that end, Dr. Kalash explained that "the State had an obligation to supervise and monitor, or at least report to authorities and to next of kin that she was not where she should be. She didn't arrive in the residence or she missed a certain check-in time" (T1: 98).
On cross-examination, Dr. Kalash acknowledged that at the time of her disappearance, Miss Xie was a voluntary outpatient; and that from the time she lived at Crisis from March 8, 2019, until her disappearance on April 4, 2019, she was a voluntary outpatient, which meant that there were no restrictions on her movement from and within the facility. When Miss Xie was discharged from Jacobi, the doctors had concluded that she was mentally stable; not suicidal; did not require inpatient admission; and was proper for outpatient care. Jacobi's discharge plan entailed continued outpatient treatment at MPC, while living at the Crisis Residence with the ability to move freely in and out of Crisis. In response to a question posed regarding whether Miss Xie was capable of participating in her discharge plan, Dr. Kalash maintained that "[i]f you don't examine for capacity, you wouldn't be able to judge a person's ability to make a decision. So if we never questioned her ability to make a decision, of course there would be nothing in the record" (T1: 104-105). Nonetheless the Jacobi records revealed that she was found to be appropriate for outpatient treatment.
On redirect, Dr. Kalash stated he saw nothing in the Jacobi records in response to the question whether "there [was] anything in the record that states that [Miss Xie] had the capacity to indicate that she should be in a voluntary outpatient residence," that (T1: 107). Even if placed [*6]at Crisis as a voluntary outpatient, Crisis would still "have a responsibility to the resident" (id.). 
DEFENSE CASE
At the time of trial, Lucy Borges-Smith was employed by the New York State Office of Mental Health, Manhattan Psychiatric Center, as the Director of Community Services, where she oversaw the outpatient 125th Street Clinic. In April 2019, she held the same position and responsibilities for the Clinic, as well as temporary supervision of Family Care and the mobile integration team. The outpatient clinic provided services including "medical management, psychotherapy, support groups [and] [s]ervices to help people with serious mental illness live in the community" (T3:80). The Family Care program "is strictly a residential program, so they live—family-care providers apply to be family-care providers and they work with the program manager and they provide meals, some sort of supervision for assistance with — to help them with their A.D.L.s they need help, self care like bathing and dressing and laundry, cleaning their rooms" (T3: 81). 
Ms. Borges-Smith supervised Crisis, which housed "[a] lot of undocumented folks," from November 2001 to July 2010 (T3: 82). The difference between Crisis and T.L.R. is related to Medicaid billing for which undocumented clients are ineligible. Participants are free to leave Crisis as they wish. 
While she did not know when she first interacted with Miss Xie, who was an outpatient at the Clinic, she was aware that the latter had been an inpatient at Jacobi Hospital in March 2019. This hospitalization was the result of Miss Xie coming from her bedroom "towards the provider in the kitchen and she had a knife towards [Miss Xie's] wrist " (T3: 85). While she did not recall how long Miss Xie remained at Jacobi, she was involved in her discharge plan from the hospital. Specifically, because the hospital had filed a complaint with the OHM Monitoring Unit that Family Care was delaying Miss Xie's discharge, she helped find a bed at Crisis since the Family Care provider no longer wanted Miss Xie at her residence and they could not obtain another provider. February 19, 2019 and February 27, 2019, progress notes from Miss Xie's social worker at the Clinic revealed that Miss Xie was ready for discharge from Jacobi in February 2019 but there were no beds available at Family Care (T3: 94-95; Defendant's Exhibit D: 706-707). 
T.L.R. serves as a short-term residence of up to about six months, where patients discharged from an inpatient facility get "to demonstrate to longer term private nonprofit agencies that they can make appointments, take their medication, [and] clean their rooms" in order to obtain permanent housing (T3: 87). 
At some point when Miss Xie was first discharged from MPC, she would return for outpatient Electroconvulsive therapy ("ECT"). Ms. Borges-Smith recalled having a conversation with a social worker from Jacobi Hospital wherein she asked if Jacobi could keep Miss Xie and then send her back to MPC so that she could receive ECT. The social worker confirmed that Miss Xie was "not suicidal and [was] doing well and appropriate for outpatient " (T3: 89; Defendant's Exhibit H: 689). Ms. Xie was discharged on March 8, 2019, from Jacobi Hospital and enrolled at the Clinic. Under Office of Mental Health regulations, all psychiatric admissions must be seen at an outpatient clinic within five days of discharge from the hospital.
Hence, Miss Xie had a face-to-face visit with her social worker on March 11, 2019, during which she indicated that she had been mistreated by her Family Care provider; felt better living at Crisis; was complying with her medication; was not using alcohol or drugs; and denied [*7]experiencing hallucinations. Her psychiatrist, Dr. Hwang, reported that Jacobi had adjusted Miss Xie's medication, and she refused to restart her ECT sessions. Her social worker assessed her as low risk for suicide, without any complaints of suicidal ideation or homicidal ideation. She "is on low risk at this time, patient reports no problem or concerns at this time, supportive counseling provided" (T3: 96-97;99; Defendant's Exhibit D: 708). She was scheduled to return to see her social worker on April 10, 2019 (Defendant's Exhibit D: 709).
Dr. Hwang's March 11, 2019, progress note revealed that during his face-to-face meeting with Miss Xie, she, inter alia, denied hallucinations and delusions, as well as any suicidal or homicidal ideations or acute distress (T3: 102-103; Exhibit D: 711). During rounds with the staff, Dr. Hwang confirmed that Miss Xie was not at risk for suicide (T3: 105-106).
Miss Xie's undocumented status affected her housing options in that without benefits, she could not be referred to any private non-profit agencies. When a person has dropped out of the outpatient program, a diligent search entails contacting the shelter system, family, friends, case management programs, and searching "everywhere," including the morgue, but not the police. This would be done once a week. They do not call the police since a person who receives outpatient care is doing so voluntarily. Miss Xie was an outpatient in March and April 2019 (T3: 107-108). 
An April 12, 2019, progress note from Miss Xie's Social Worker, Ms. Markose, revealed that in her efforts to locate Miss Xie, she confirmed that Miss Xie was not in the shelter system nor the Department of Corrections system. She also spoke with Ms. Cui, who had no information about her Aunt's whereabouts (Defendant's Exhibit D: 720). The Outpatient Clinic was notified at midnight on Friday April 5, 2019, via a "T.L.R. acuity report" that Miss Xie was missing but this report was not seen until Monday, April 8, 2019 (T3: 113). Although residents at Crisis were free to come and go as they pleased, and could even leave Wards Island, there was a 10 p.m. curfew, which was predicated on ensuring that medications were taken at night and the fact that the public M35 bus stopped running by then.
The Clinic does not notify family members if someone is missing. Rather, they will contact them to see if they know of the client's whereabouts in order to try to locate the individual. Although some progress notes reflected that Miss Xie attempted to commit suicide, she only "exhibit[ed] a suicidal gesture" with the knife (T3: 122-123). When Dr. Hwang and social worker Ms. Markose spoke with the Jacobi Hospital team, the latter "clarified it was a gesture" and not a suicide attempt as originally had been reported by the Jacobi Hospital team (T3: 123-124). Notations from Miss Xie's medical records from Jacobi were checked off for an "actual suicide attempt" and "suicidal thoughts with method, but without a specific plan or intent to act" (Exhibit H: 41; T3: 124-125).
Ms. Borges-Smith initially testified that following her release from Jacobi, Miss Xie was not placed on the "high-risk policy list" but was later placed on the list on April 4, 2019, after she was reported missing (T3: 125-127). She later clarified, however, that she was mistaken in her testimony; rather, Miss Xie was placed on the missing list (T3: 134-135). In looking at the High-Risk Policy for the 125th Street Outpatient Clinic (Exhibit S), "Consumers on the high-risk list are monitored by supervisory staff to ensure that levels of treatment and surveillance are commensurate to risks variations Whenever a consumer on the high risk list misses a scheduled appointment, outreach by the social worker or designee occurs and may include contacting the consumer's residence I.C.M. [Intensive Case Management] or involving a mobile crisis team" (T3: 135-136). Miss Borges-Smith did not believe that Miss Xie should have [*8]been placed on the high-risk list, given the findings by her social worker and psychiatrist that she was not at risk. 
A "Weekly Treatment Plan Review for Week #4 dated March 1, 2019, from Jacobi reflected that "[i]f discharged now, an early recurrence of physical danger to self/others would likely recur soon, and continued hospitalization is necessary to prevent this" (Exhibit H: 78 [FN3]
; T3: 139).
Miss Borges-Smith was not aware that Miss Xie had been missing on March 12th or 13th, 2019. There were video cameras on the grounds at T.L.R. and Crisis in April 2019. There was a security gate "to get onto the grounds where the State Police and the hospital" were located, which always remained open (T3: 141). 
Starting in 2018, Sanju Thomas was employed by OMH as a Licensed Master Social Worker One assigned to T.L.R., which serves as a temporary residence for psychiatric patients who have been discharged from inpatient care but lack a residence in the community. Both T.L.R. and Crisis service discharged inpatients, with the latter serving "mostly those who are undocumented" (T4: 16). T.L.R. and Crisis are in separate buildings within walking distance of each other on Wards Island.
In March and April 2019, he provided placement services for residents at Crisis for housing in the community. At that time, there were about ten residents at Crisis; although it operated on a 24-hour basis, it was closed to patients during the daytime. Thus, patients left around 8 — 8:30 a.m. and returned after 5:00 p.m. During this time, they could attend any of their programs or appointments or go to T.L.R. Within the first few weeks as a resident, there was a 7 p.m. curfew for patients and thereafter, a 10:00 p.m. curfew weeknights and 11:00 p.m. on weekends. Even if a resident met the curfew, they were free to leave the building; there were no restrictions on their movement. The difference between T.L.R. and Crisis was whether the resident had insurance.
In March or April 2019, Mr. Thomas was assigned as Miss Xie's Social Worker. Residents were not required to check in and out upon entry or exit from Crisis in 2019. A resident at Crisis is deemed missing if they fail to appear for twenty-four hours, whereupon the staff conducts a diligent search. This entails calling nearby hospitals, shelters, family members or friends and 911, with NYPD officers then coming to T.L.R. 
Mr. Thomas met face-to-face with Miss Xie when she was admitted to Crisis on March 8, 2019. His progress note reflects that her diagnosis was schizoaffective disorder upon her discharge from Jacobi. It further states that she was taken to Jacobi on February 2, 2019 "[a]fter she was found placing a knife on her wrist. Although there was no contact between the knife and her wrist, she was taken to hospital for Psychiatric evaluation. She was discharged from [Jacobi] after being cleared by the treating team. Client ha[s] a history of suicidal ideation. Ms. Xie will receive mental health services from MPC 125th Street Clinic" (Defendant's Exhibit E: 90; T4: 25-26). The mental health services to be provided to Miss Xie were outpatient. There was no medical care provided at Crisis. There were Mental Health Therapy Aides who were charged with providing residents with their medication in the morning and evening; they also made log entries of whether residents were in or out of the premises. The nursing staff, who were located at T.L.R, would "oversee the administration of medication" at Crisis (T4: 28).
On March 14, 2019, Mr. Thomas prepared a progress note indicating that Miss Xie had failed to report to Crisis before 7:00 p.m. on March 12, 2019, and was later found on March 13, 2019 "near [the] Queens entrance in Wards Island" (Exhibit E: 93; T4: 29). She was then transported to NY Presbyterian/Weill Cornell Hospital for evaluation and then discharged back to Crisis. In that instance, since she had not been missing for more than twenty-four hours, there was no need to conduct a diligent search. T.L.R. and Crisis staff jointly held daily morning meetings where they discussed any missing residents or new admissions, including this March incident with Miss Xie.
On April 8, 2019, Mr. Thomas prepared a progress note reflecting Miss Xie was missing on April 4, 2019, when she failed to return before the 10:00 p.m. curfew. As part of their policy, the Nurse Administrator notified the Justice Center, a state agency, that Miss Xie was missing. Upon notification to the NYPD, an officer responded to T.L.R. but refused to take a Missing Person's Report and "stated that the client is not mandated to stay at T.L.R. and she's free to come and go back. Client is not considered missing" (T4: 33-34; Exhibit E: 95).
When he called Ms. Cui to advise her that her Aunt was missing, he also suggested that she should file a Missing Person's Report. He used information from past Family Care discharge documents to obtain Ms. Cui's contact information. When Miss Xie started at Crisis on March 8, 2019, she refused to sign a consent form for family contact information. A consent form at the Clinic cannot be used at Crisis.
On April 16, 2019, he made a Progress Note indicating that Ms. Cui came to T.L.R. with two officers on April 14, 2019; while he was not present for the visit, it was part of the morning notes (Exhibit E: 97). As part of his weekly diligent search, he called both sites for Mount Sinai Hospital on April 17, 2019 (Exhibit E: 98). He is not allowed to leave the building to search for a missing resident. On April 18, 2019, he called the Shelter system, but Miss Xie was not housed at any shelter (Exhibit E: 99).
He prepared a discharge note on April 26, 2019, reflecting the death of Miss Xie, who was found by NYPD officers on April 25, 2019, following the missing person's report filed by her niece on April 14, 2019 (Exhibit E: 104). In March and April 2019, Miss Xie had no restrictions on her movement to prevent her from leaving Crisis.
On cross-examination, Mr. Thomas confirmed that residents were free to come and go from Crisis and that Mental Health Therapy Aides ("MHTA") gave them their requisite medication. T.L.R. and Crisis are not advised if a person is missing from Family Care. He was not aware of any disappearance prior to March 2019. The discharge notes which he reviewed for his March 8, 2019, progress note, reflected that Miss Xie had a history of suicidal ideation and that she had "placed a knife on her wrist. There was no contact" (T4: 45-46; Exhibit E: 90).
There is no difference between the search conducted for a missing resident from T.L.R. or one from Crisis. His Progress Note from April 8, 2019, was written over thirty hours after Miss Xie's April 4, 2019 disappearance without a diligent search having been conducted (T4: 48-49; Defendant's Exhibit E: 95). As of the time of his April 8, 2019, progress note, no one had left the building at T.L.R. to search the surrounding area for Miss Xie because staff is not allowed to do so (T4: 50-51; Exhibit E: 99). Family members will not be contacted if a resident is missing unless the latter signs a consent form. He believed that Miss Xie had not consented because he conducted her admission and if she had signed the consent form it would have been in the file. However, he did not remember whether or not there was a signed consent (T4:53-54). There would be a notation in his progress note only if a resident had signed the consent form. [*9]Irrespective of whether a resident has a mental diagnosis, they still retain the decision to give or withhold consent. He believed he called Ms. Cui and suggested that she file a Missing Person's Report but had no recollection of the date or if anyone was around when he spoke with her. Nor did he recall if she asked him whether he had filed a Missing Person's Report. He was not aware that Ms. Cui came to Crisis with her friend to search for Miss Xie on April 10, 2019. Mr. Thomas was not familiar with the "high-risk list." Although the medical record from Jacobi indicates that Miss Xie had a superficial cut to her wrist and had attempted to commit suicide (Exhibit H: 41), Mr. Thomas did not recall that she had been on any such list.
While residents were encouraged to return before curfew, they could still depart from campus after timely returning. There were only notes on April 8th and April 12, 2019, because progress notes are not prepared unless something has occurred during a period. He did not recall if Ms. Cui was called after Miss Xie was discharged from Jacobi.
At the time of trial, Dr. Matthew Majeske was a Hospitalist for Mount Sinai System (hereinafter "Mount Sinai") which included work in inpatient services, psychiatric emergency rooms; and electroconvulsive therapy. He was previously the Director of the Geriatric Psychiatry Clinic at Mount Sinai for ten years; and has been board-certified in psychiatry since 1991.
An inpatient psychiatric patient is not free to leave while housed within a locked ward at an inpatient facility; they remain there for treatment until they may be able to be transferred to a lesser care level. On the other hand, an outpatient psychiatric patient is "a free citizen" who is advised to participate in outpatient psychiatric treatment given the "chronic, relapsing" nature of psychiatric conditions (T4: 74-75). It is up to that patient to decide if they follow a doctor's care plan.
Dr. Majeske reviewed the Claim, Miss Xie's records from Jacobi, MPC, the 125th Street Clinic and Crisis; case notes from Family Care; the police report, autopsy, policies of the Clinic; and the deposition transcripts of Ms. Cui, Ms. Borges-Smith, Ms. Paul, and the social worker from Crisis.
Based upon his review of the records, Dr. Majeske's expert opinion was that at the time of Miss Xie's disappearance, she was an outpatient and that "her level of supervision was appropriate" (T4: 76-77). He explained the basis for his opinion as set forth in the Conclusions of Law section, infra.
Dr. Majeske also opined that Miss Xie "was not high risk, that she was low risk. And placing her on a high-risk roster was not appropriate" upon her discharge from Jacobi on March 8, 2019 (T4: 79-80; Exhibit S). The basis for his opinion is also set forth in the Conclusions of Law section, infra.
While two of the high-risk list factors are a suicide attempt within the preceding year and suicidal ideation with plan, Dr. Majeske opined that when Miss Xie "was admitted to Jacobi, she made a superficial scratch on the dorsum of her left wrist at the top. And [he] would characterize that as a suicidal gesture not a suicide attempt" (id. at 82). Thus, he still opined that this would not have placed her on the high-risk list upon her discharge from Jacobi. In distinguishing a suicidal gesture from a suicidal attempt, he noted that "sometimes patients engage in self-injurious behavior, it can be superficial scratches or doing something that might be considered dangerous, but does not involve an actual attempt to end one's life" (id.). He concluded that while Miss Xie "was having those feelings at the time she was admitted, she was very upset about what was happening in her family-care situation that she had a conflict with [*10]Ms. Faith Robinson, but that she wasn't trying to kill herself" (id.).
Miss Xie was on a number of psychiatric medications: antipsychotics — Olanzapine and Haloperidol; Depakote and Lithium, both mood stabilizers; Mirtazapine and Bupropion, both antidepressants; as well as medication for medical conditions such as high blood pressure, diabetes and low thyroid. There were myriad side effects that one could possibly experience from both sets of medications, including dizziness, restlessness, difficulty swallowing or speaking; restlessness, confusion, abnormal thinking and headaches. Miss Xie took these medications daily. He opined that someone taking all these medications "may begin to feel poorly She might experience insomnia, she actually might feel better, at least briefly, because she had the effect of all these psychiatric medications, you know, not there" (T4: 89).
Some outpatients require more monitoring than others depending on their level of illness. Dr. Majeske maintained that even with the factor of the medications that Miss Xie was prescribed, she was not appropriate for the high-risk list for the reasons he stated earlier on direct in that "it was a clinical judgment based on the totality of her clinical circumstances that she did not need to be on the high-risk roster" (id. at 91). He defined hypothermia but did not know the length of time a person might remain alive in 40-degree water. He reviewed the level of supervision as set forth earlier including peer staff, nurses, social workers; the immediacy of assistance to the psychiatric emergency room on March 13, 2019; the call to the Justice Center; the call to the police; the employment of the diligent search protocol; the eventual contact of her niece and opined that "this was an appropriate level of supervision" (T4: 94-95). 
Psychiatric patients can sometimes lie about their true feeling during evaluations. If the staff at Crisis did not know about the existence of the high-risk list, the question of whether that constituted negligence "would depend on where she was getting — where this hypothetical patient was getting their psychiatric care" (T4: 96-97).

CONCLUSIONS OF LAW
Claimants maintain that given Miss Xie's prior attempts at suicide, her multiple occasions of disappearances, the number of medications that she was prescribed, the failure to notify Ms. Cui of her disappearance in a prompt manner and the failure to place her on the high-risk List, Defendant was negligent in its failure to properly supervise her. According to Claimants, "[t]he negligence of the Crisis Residence in failing to notify the next of kin and failing to place Yanfang Xie on the high-risk list directly contributed to her death. Had they implemented appropriate supervision, conducted a thorough search, and promptly notified her niece, there was a strong likelihood that she would have been found and her death averted" (Claimant's Post Trial Brief at 5). 
Defendant counters that given Miss Xie's outpatient status, there was no evidence presented at trial that "she should have been restricted from leaving the Crisis Residence or that staff failed to adequately supervise" her; or that she was suicidal; or "that the staff at either the Crisis Residence or outpatient clinic failed to comply with M[iss] Xie's level of supervision" (Defendant's Post-Trial Memorandum at 14-15). 
Here, "the instant claim is not premised upon any alleged error in the professional, medical or psychiatric judgment of the [hospital's] employees, but is instead grounded upon the alleged negligent failure of the State to protect [Miss Xie] from reasonably foreseeable harm" (Goble v State of New York, 123 AD2d 664, 665 [2d Dept 1986])(Patient at psychiatric center struck with chair by another patient). Accordingly, the case is properly before this Court as a [*11]negligence matter (Harrienger v State of New York, 73 Misc 3d 1204(A) [Ct Cl 2021]).
It is well settled that "[t]he State owes patients in its institutions a duty of reasonable care to protect them from injury, whatever the source This does not, however, render the State an insurer or require it to keep each patient under constant surveillance The degree of care owed is commensurate with the patient's capacity to provide for [their] own safety" (Killeen v State of New York, 66 NY2d 850, 851-852 [1985] [internal citations omitted]; Sanchez v State of New York, 99 NY2d 247, 252-253 [2002]). "[I]t is black letter law that an essential element of a negligence claim is the breach of a duty" (Anderson v Commack Fire Dist., 39 NY3d 495, 502 [2023]). "To establish a prima facie case of negligence, a [claimant] must demonstrate (1) a duty owed by the defendant to the [claimant], (2) a breach thereof, and (3) injury proximately resulting therefrom" (Solomon v City of New York, 66 NY2d 1026, 1027 [1985]). 
Where a person is "a voluntary outpatient, the State's control over him, and consequent duty to prevent him from harming others, is more limited than in cases involving persons confined to mental institutions" (Schrempf v State of New York, 66 NY2d 289, 296 [1985]). Thus, a voluntary outpatient cannot be forced to remain in a facility or prevented from leaving that facility even if they were having suicidal thoughts a month earlier (Kowalski v St. Francis Hosp. and Health Ctrs., 21 NY3d 480, 486 [2013])(hospital not liable where voluntary outpatient sought admission to detoxification unit but left four hours later and was struck by a vehicle, although he had been admitted a month earlier with suicidal thoughts and then discharged). 
The evidence at trial confirmed that MPC and Crisis did not breach any duty owed to Miss Xie by failing to properly supervise her. First, at the time that Miss Xie disappeared on April 4, 2019, she was a voluntary outpatient without any restrictions on her movement from either the Crisis Center or the Clinic. The facility had in place a process whereby it kept log entries in order to ascertain if a resident failed to meet curfew. Nonetheless, even where a resident of Crisis such as Miss Xie came back to the facility by curfew, they were free to then leave the facility thereafter. And during the hours from 8:00 a.m. to 4:00 p.m. when Crisis was closed to residents, they had the choice to leave Wards Island to go to the Outpatient Clinic at 125th Street in Harlem or any place else they wished to explore, or to remain at T.L.R. Furthermore, prior to her time at Crisis, when she was in Family Care, Miss Xie was also free to leave the assigned family provider's home as she pleased.
Next, the pertinent question here lies in an assessment of Miss Xie's psychiatric condition immediately preceding her disappearance. To that end, this Court finds the testimony of Defendant's expert, Dr. Matthew Majeske, to be more credible and convincing than that of Claimants' expert, Dr. Kalash. 
Based upon his review of the records, Dr. Majeske's expert opinion was that at the time of Miss Xie's disappearance, she was an outpatient and that "her level of supervision was appropriate" (T4: 76-77). The basis for his opinion was that "when she left Jacobi Hospital on March 8, 2019, she had improved and was considered to be low risk [for suicide, or violence] and able to engage [in] outpatient treatment She was taking medication, denying symptoms, then three days later she went to her clinic appointments at the 125th Street Clinic on March 11th. At that time, she had visits with her psychiatrist, with her social worker, and with her medical doctor, they all judged her to be low risk" (T4: 77-78). Furthermore, at Crisis, there was support where nurses helped with the distribution and dispensing of medication; peer support staff to intervene if she displayed "obvious signs of mental illness;" (id.); and social workers trying to [*12]help find permanent housing. And when on March 12th she failed to appear at Crisis, she was immediately sent to the psychiatric emergency room which deemed her to be able to return to outpatient care at Crisis. Thus, "there were three consecutive — there was the evaluation just as she was leaving Jacobi, there was the evaluation on March 11th in the outpatient clinic, and then the E.R. visit a couple of days later. And in each instance, she was judged to be able to return to outpatient care [Dr. Majeske] believe[d] that the level of supervision for such a patient who's low risk, who is deemed appropriate for outpatient was appropriate" (T4: 78-79). 
Dr. Majeske also concluded that Miss Xie's disappearance on March 12th did not require a change in the level of her supervision because "she was judged to be psychiatrically stable, and as a voluntary outpatient, she was at liberty to come and go as she pleased. And so [he] th[ought] all of those consecutive evaluations of the patient felt that she was well enough to — to be able to continue outpatient care" (T4: 79).
Dr. Majeske also opined that Miss Xie "was not high risk, that she was low risk. And placing her on a high-risk roster was not appropriate" upon her discharge from Jacobi on March 8, 2019 (T4: 79-80; Exhibit S). He based his opinion on the grounds that "she had improved while she was in the hospital her symptoms had receded, she was no longer endorsing suicidal thoughts or homicidal thoughts or hallucinations. And she said that to the clinicians who evaluated her when she left Jacobi. She said that to the clinicians when they evaluated her at the 125th Street Clinic" (id.). And although he had not seen the evaluation from Columbia Presbyterian, "given that they discharged her almost soon after evaluating her, my assumption is that her presentation was pretty similar also at the emergency room" (id. at 80-81). 
Dr. Majeske further opined that when Miss Xie "was admitted to Jacobi, she had made a superficial scratch on the dorsum of her left wrist at the top. And [he] would characterize that as a suicidal gesture not a suicide attempt" (id. at 82). Thus, he still opined that this would not have placed her on the high-risk list upon her discharge from Jacobi. In distinguishing a suicidal gesture from a suicidal attempt, he noted that "sometimes patients engage in self-injurious behavior, it can be superficial scratches or doing something that might be considered dangerous, but does not involve an actual attempt to end one's life" (id.).
Claimants' position that "[i]n all likelihood — and considering where Ms. Xie's body was ultimately found — a reasonable search just off the MPC grounds (or at least outside the buildings themselves) may have led to finding the patient" (Claimant's Post-Trial Brief at 4), is mere speculation. Notably, after Miss Xie's disappearance, Crisis followed protocol by calling the Justice Center; conducting a diligent search by calling various entities, including shelters, hospitals and the police; and ultimately confirming that Ms. Cui had no information of her whereabouts and encouraging her to file a Missing Person's Report. Prior to her disappearance, there was no evidence of any issue involving Miss Xie from March 13th until her disappearance on April 4th. Furthermore, the evidence set forth in the testimony of various witnesses and exhibits, as set forth above, support Dr. Majeske's opinion that Defendant exercised appropriate supervision of Miss Xie.
Finally, the Court rejects Claimants' contention that if Crisis had notified Ms. Cui of Miss Xie's disappearance earlier, that somehow her death could have been averted. But this argument is premised on speculation that the cause of Miss Xie's death was drowning. The fact is that although Miss Xie's body was found floating in the East River thirteen days after her disappearance, the Medical Examiner concluded that the cause of her death and the manner of death was "undetermined" (Defendant's Exhibit F).
In light of the foregoing, Claimants' claim for wrongful death must also fail since Claimant did not demonstrate that it was more probable than not that Defendant was negligent and that negligence was a substantial factor in causing Miss Xie's death. To that end, Claimant did not establish either through direct or circumstantial evidence that Miss Xie suffered conscious pain and suffering (Fiederlein v New York City Health and Hosps. Corp., 56 NY2d 573, 574-575 [1982] [where the decedent's body was recovered from the Hudson River almost two months after being released on a pass from a psychiatric ward, "[t]he evidence was insufficient to form the basis for a jury award of damages for conscious pain and suffering. Mere conjecture, surmise or speculation is not enough to sustain a claim for damages. There was no direct proof of the cause of the decedent's death and, more importantly, there was no proof of conscious pain and suffering in connection with that death"])
Finally, to the extent Claimants sought wrongful death damages, Claimants provided no evidence at trial of any pecuniary losses. Rather, the evidence established that Miss Xie had not worked for a lengthy period, and had not supported herself or Ms. Cui. Furthermore, Claimant did not provide any proof of funeral expenses or Miss Xie's prior earnings (Heslin v County of Greene, 14 NY3d 67, 76-78 [2010]).
In sum, upon consideration of all the credible trial testimony and the exhibits at trial, the Court finds that Defendant provided adequate supervision of Miss Xie. Claimants have failed to prove by a preponderance of the evidence that the State of New York is liable for the tragic death of Miss Xie.

CONCLUSION
Based upon the foregoing, the Clerk of the Court is directed to enter Judgment on the issue of liability, finding Defendant, the State of New York, not liable for the death of Miss Xie and dismissing Claim Number 137097.
Any other evidentiary rulings upon which the Court may have previously reserved, or which were not previously determined are hereby granted in Defendant's favor.
LET JUDGMENT BE ENTERED ACCORDINGLY.
DATED: November 25, 2025
NEW YORK, NEW YORK
HON. RUTH SHILLINGFORD
Judge of the Court of Claims

Footnotes

Footnote 1:Court Exhibits 1 and 2 relate to requests to charge by the parties.

Footnote 2:
Quotes from the testimony of the witness are from the transcripts as follows: "T" refers to the Transcript dated March 18, 2024; "T1" to March 19, 1024; "T2" to March 20, 2024; "T3" to June 24, 2024; "T4" to June 25, 2024; and "T5" to June 26, 2024.

Footnote 3:The actual page is 67 on the document itself.